2023 IL App (2d) 220419-U
No. 2-22-0419
Order filed August 11, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-224 |
| NOAH D. MacCALLUM, | ) ) | Honorable Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The victim's written statement to the police inculpating defendant was sufficient, along with other trial evidence, to support defendant's domestic battery convictions even though the victim recanted both in a subsequent written statement and at trial.

¶ 2    Following a jury trial, defendant, Noah D. MacCallum, was convicted of two counts of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2020)) and sentenced to two concurrent three-and-one-half-year prison terms. On appeal, defendant argues that the State failed to prove him guilty beyond a reasonable doubt because the only direct evidence against him was the victim's

prior written statement, which she recanted both in a subsequent written statement and at trial. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On April 28, 2022, defendant was indicted on two counts of domestic battery (*id.*) relating to an incident that occurred on April 8, 2022. Count I alleged that

> "defendant, knowingly made physical contact of an insulting or provoking nature with Stephanie L. Kruszyna, a family or household member of *** defendant, in that *** defendant pushed [her] off of a chair and onto the floor, and [that] defendant had previously been convicted four (4) times of the offense of [d]omestic [b]attery."

Count II was identical to count I except that it alleged that "defendant thrust his foot into the body of *** Kruszyna."

¶ 5     The relevant trial testimony established the following. Village of Johnsburg police officer Daniel T. Harvey testified that, on April 8, 2022, he responded to a dispatch concerning "a physical domestic where the victim was threatened with a knife." Arriving at the address provided, Harvey and his partner Officer Eddie Santana and Sergeant Michael Vollmer encountered Kruszyna and defendant. Harvey entered the residence and spoke with Kruszyna while defendant stepped outside and spoke with Santana and Vollmer.

¶ 6     According to Harvey, Kruszyna "was very upset and she seemed to be in pain. It was very labored movements and labored speaking, and then she was also intoxicated." "She held her back. She verbally complained of pain ***." Kruszyna intermittently cried while they spoke. Kruszyna told Harvey she argued with defendant about his "unlawful use of her credit card to purchase hard alcohol." During this argument, Kruszyna was sitting on a chair in the kitchen, and defendant was "in the back room." Defendant exited the back room and "saw [Kruszyna] sitting in the chair and

didn't like the way that she was sitting and because of this, he put her—his hand on her shoulder and pushed her to the ground." After Kruszyna "crashed to the ground, she—it sounds like she was crying, and [defendant] began nudging her with his foot saying, hey, stop crying." After Kruszyna got up and sat in the chair, defendant "grabbed a cleaver that was used to slice the pizza that they were eating and came back over and told her, you know, don't f*** with me, bitch; you're a cop caller; I'm never going to go to jail." Defendant "then proceeded to put the cleaver on the table where she sat and then returned to the room." Harvey observed a cleaver in the kitchen. Harvey also observed abrasions on Kruszyna's elbow and a bruise on her right bicep. Harvey identified People's Group Exhibit B as photographs taken that day of Kruszyna and her injuries.

¶ 7     After speaking with Kruszyna, Harvey spoke with defendant, who was "[c]alm, also intoxicated." Harvey observed "slurred speech, watery, glassy eyes," and defendant admitted to consuming alcohol. When Harvey asked defendant why the police were called, defendant "stated that nothing [Kruszyna] stated had happened and that he had been inside of the back room writing, drinking Twisted Tea lemonade, and eating frozen pizza, and he was there approximately 40 minutes before police arrival."

¶ 8     After speaking with defendant, Harvey, joined by Vollmer, spoke again with Kruszyna. Harvey testified that, after giving Kruszyna time to think, he "wanted to have her tell [him] the story again to make sure there were no differences between the first and the second story." Kruszyna repeated her version of events to the officers, which Harvey testified was consistent with what she had earlier related to him. Kruszyna agreed to prepare a written statement. Harvey identified People's Exhibit A as Kruszyna's signed handwritten statement that she prepared at the kitchen table in Harvey's presence. Kruszyna's statement was admitted into evidence without objection. The statement reads:

"Tonight [defendant] took my debit card and bought hard liquor with my card without my permission except to buy beer & cigarettes. I noticed a change in his behavior so I knew he was drinking whiskey. I had left the living room and sat in the kitchen to avoid any altercations between us. He came into the kitchen where I was at and started yelling at me. So I begged him again to leave me alone and not to talk to me. I continued listening to Cher on my phone. Then he put a hatchet knife in front of me and said he dared me to call the cops on him again or else! Then he went to his room in the back that he calls his office. He came to the kitchen where I had been & yelled at me and pushed me off the chair because I told him I was done with him and his drunk behavior. I layed there crying in the kitchen and he called me 'a baby' and nudged me with his foot to get up, so I did and called the police for help because I was scared."

Before Kruszyna wrote the statement, Harvey gave her "basic instructions" to "write it as if [she] were writing a story." Neither he nor Santana told Kruszyna what to write in her statement.

¶ 9    Vollmer testified that he "heard some arguing inside" as he approached the residence. The officers knocked on the door and "found both [defendant] and [Kruszyna] in the common area, kitchen family area of the residence." Vollmer knew the parties because he had "had numerous contacts at th[eir] residence." Defendant went outside and spoke with Vollmer and Santana. Vollmer testified that defendant was "collected" but "noticeably intoxicated" and "appeared tense." Defendant told them "that he was between upset and angry."

¶ 10    Vollmer testified that defendant provided inconsistent versions of what had transpired that evening. Defendant initially told Vollmer that he had been in the bedroom all night and had no idea that the police were there until they knocked on his bedroom door. Vollmer testified that, for that version to be accurate, the officers would have had to walk through the living room and kitchen

to get to the bedroom door. In a different version, defendant acknowledged having a verbal disagreement with Kruszyna about two different matters. One matter involved him using Kruszyna's credit card without her approval to make liquor purchases. The other matter involved cooking a pizza but giving her only a few slices. When Vollmer inquired further about how many pizza slices defendant gave Kruszyna, defendant "backtracked" and told Vollmer, "[O]h, no, I had my own pizza, and I brought my pizza into the room." Vollmer testified that it seemed that defendant was

> "torn between whether or not he wanted to give [Vollmer] the story where he had a verbal disagreement *** with [Kruszyna] or if he was trying to continue with the story that he had no idea and he was just secluded in his room without any knowledge of anything that was going on."

¶ 11 Vollmer also spoke with Kruszyna, who said that "[defendant] became upset with her and that at one point he came out of his room and didn't like that she was slouching in the chair and told her to sit up and then pushed her on the shoulder causing her to fall on the floor." She further told him that when she was on the floor crying in pain, defendant told her "to stop, *** being a cry baby [*sic*] and get up off the floor." Kruszyna also told Vollmer that defendant placed a knife in front of her, called her a "cop caller," and told her "not to mess with him." Kruszyna never mentioned having a seizure.

¶ 12 Kruszyna testified that, on April 8, 2022, she lived with defendant in a duplex in Johnsburg. Kruszyna and defendant had dated for 22 years and were engaged. According to Kruszyna, on the evening of the incident, she "was having one of [her] episodes where [she] was *** missing *** [her] brother," who was deceased, and she "wanted to get drunk." Defendant did not want to get alcohol for her, but she "made him." She gave him her "card," and he went to buy her alcohol.

Kruszyna never saw defendant drink alcohol that night, and she did not remember arguing. She testified:

> "[H]e was in his office and he does writings and he gets away from me when I'm having my episodes. And he heard me going to fall, and he came and grabbed the chair, but I—I freaked out because I hit my head and I thought he pushed me. And then I came out—I had a seizure. I came out of it finally, but I didn't understand. I don't know. All I know is my name after I have one. It's embarrassing. And so I thought, oh, my God because he's always worried about me hitting my head. And I couldn't believe he would do that to me, so I was upset. And I didn't know what was going on around me. And then after it was all said and done, then I remembered and the police know I don't know nothing. I'm out of it. It's hard to explain. You don't understand. You don't know nothing. Oh, my God. You don't even know you had a seizure. And I always tell him, no, I didn't. He goes, you just had another one."

Kruszyna denied that defendant pushed her out of her chair and nudged her with his foot.

¶ 13 Kruszyna testified that she called 911 because "[she] ha[s] a habit of dialing 911 because [she's] scared all the time." When asked whether she told the police that defendant pushed her out of the chair, she responded: "I told them that I thought—I did think that he wanted me—he wanted me to fall because I seen his hand by the other part of the chair, and I just—they were already gone and he was already in jail, and then I remembered things."

¶ 14 Kruszyna testified that the police "had [her] write something." She told them she "can't write" and "can't see the lines." Kruszyna identified People's Exhibit A as the statement she prepared and signed. According to Kruszyna, as she was writing the statement, the police officers were "telling [her] just don't forget this that you had said, don't forget this." Kruszyna testified

that she told the police that she "had a seizure" and she "still was out of it." She further testified that she loved defendant, that he helped take care of her and the house, that he supported her financially, that she wanted to help him, and that she wanted him back in her life. She agreed that defendant had a prior conviction for domestic battery against her but stated that "he didn't do it."

¶ 15    On cross-examination, Kruszyna testified that she takes eight different medications, including "Lamictal for [her] seizures," "Cymbalta for [her] mood swings," and "Claritin" for "bad allergies." She was not supposed to drink alcohol with her medication. On the evening of the incident, she drank "Captain Morgan." Kruszyna claimed that, in May (2022, presumably), she prepared "another written statement related to th[e] case," asserting that defendant did not commit a domestic battery. She gave the statement to the State.

¶ 16    Kruszyna testified further that her seizures cause her to fall and sustain bruises. When asked how often she had seizures, she responded: "It's hard to tell. Well, now I'm having them a lot from drinking or all this stress from this going on. I had four at—my neighbors know of a couple of them and I broke my nose." She claimed that a seizure caused her to fall out of her chair on April 8, 2022, and that defendant picked her up.

¶ 17    At the conclusion of the testimony, the State offered into evidence People's Exhibit C and People's Exhibit D. People's Exhibit C was an indictment charging defendant (in case No. 19-CF-515) with one count of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2018)) based on his act of pushing Kruszyna on May 2, 2019. People's Exhibit D was a "Statement of Charge & Disposition" (in case No. 19-CF-515) showing that, on November 19, 2019, a conviction of domestic battery was entered against defendant by way of a negotiated plea of guilty. The trial court admitted both exhibits, and the State rested.

¶ 18    Defendant moved for a directed finding as to both counts. The trial court denied the motion. Thereafter, defendant rested without presenting evidence. The jury found defendant guilty of both counts of domestic battery.

¶ 19    On October 4, 2022, defendant filed a motion for a new trial, asserting that the State failed to prove him guilty beyond reasonable doubt. Also, on that date, defense counsel filed a motion to appoint a special public defender, arguing that there was a conflict of interest because defendant claimed ineffective assistance of counsel.

¶ 20    On October 7 and 14, 2022, the trial court held a preliminary hearing under *People v. Krankel*, 102 Ill. 2d 181 (1984). Defendant claimed that defense counsel was ineffective for, among other things, failing to enter into evidence the exculpatory statement that Kruszyna had prepared and provided to the State. Counsel explained that he received the statement from the State during discovery and elected, as a matter of trial strategy, not to offer it. Counsel further explained that Kruszyna testified at trial to any exculpatory information contained in the statement. The court rejected each of defendant's ineffectiveness claims and declined to appoint new counsel.

¶ 21    On November 9, 2022, the trial court denied defendant's motion for a new trial. The court sentenced defendant to two concurrent three-and-a-half-year prison terms.

¶ 22    On November 15, 2022, defendant filed a motion for reconsideration of his sentence. The trial court denied the motion. This timely appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24    Defendant contends that the State failed to prove him guilty beyond a reasonable doubt of domestic battery because the only direct evidence against him was Kruszyna's prior written statement, which she recanted both in a subsequent written statement and at trial. In response, the State contends that, because defendant did not present the subsequent written statement as

evidence at trial or make it a part of the record on appeal, defendant cannot now rely on it. Further, the State argues that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of domestic battery.

¶ 25    A person commits domestic battery when he "knowingly without legal justification *** [m]akes physical contact of an insulting or provoking nature with any family or household member." 720 ILCS 5/12-3.2(a)(2) (West 2020). Domestic battery is a Class 2 felony when, as is the case here, defendant has four or more prior convictions for domestic battery. See *id.* § 12-3.2(b).

¶ 26    We review claims of insufficient evidence to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We will not set aside a conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Id.* "[I]t is not the function of this court to retry the defendant." *Id.* The trier of fact must assess the credibility of the witnesses and the weight of their testimony, resolve conflicts in the evidence, and draw reasonable inferences from that evidence, and we will not substitute its judgment for that of the trier of fact on these matters. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). "In the context of a recanted statement, the trier of fact has the responsibility 'to weigh the statement, weigh the disavowal[,] and determine which is to be believed.' " *People v. Heller*, 2017 IL App (4th) 140658, ¶ 35 (quoting *People v. Armstrong*, 2013 IL App (3d) 110388, ¶ 27), *abrogated on other grounds by People v. Veach*, 2017 IL 120649. Convictions may be based solely upon recanted prior inconsistent statements, even where there is

no corroborating evidence to support the conviction. See *People v. Craig*, 334 Ill. App. 3d 426, 440 (2002).

¶ 27   Defendant contends that there is a reasonable doubt that the offenses occurred because Kruszyna recanted her prior written statement both in a subsequent written statement and at trial. She explained at trial that her statement implicating defendant resulted from confusion brought on by a seizure and the combination of prescription drugs and alcohol.

¶ 28   Before we comment on the sufficiency of the evidence, we address the State's argument that, because defendant did not offer Kruszyna's subsequent written statement as evidence or make it a part of the record on appeal, any reference to the subsequent written statement violates the principles of *Foutch v. O'Bryant*, 99 Ill. 2d 389 (1984), and we should not consider it. However, defendant is not relying on the contents of the subsequent written statement itself but instead on Kruszyna's testimony about the statement and the fact that she provided it to the State. We are certainly free to consider that testimony, as was the jury.

¶ 29   Viewing the evidence in the light most favorable to the State, we find that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of both counts of domestic battery. Kruszyna's written statement to the police established that defendant "pushed [Kruszyna] off the chair" and then, while she was lying on the floor, defendant "nudged [her] with his foot." (There is no dispute that Kruszyna was a "family or household member" or that defendant's actions were "insulting or provoking." See 720 ILCS 5/12-3.2(a)(2) (West 2020).) To be sure, at trial, Kruszyna denied that a battery occurred and asserted that she provided a second written statement to the State recanting her prior written statement. However, as the trier of fact, the jury was charged with determining which account was more credible: Kruszyna's testimony or her written statement made shortly after the offense. (We note that defendant did not challenge below or on appeal the

admission of Kruszyna's prior written statement as substantive evidence.) The jury heard Kruszyna explain that, on April 8, 2022, a seizure caused her to fall out of her chair and that she was drinking and taking prescription medication at the time of the accident. The jury also heard Kruszyna's testimony that she called 911 only because she "ha[s] a habit of dialing 911 because [she is] scared all the time." In addition, the jury heard Kruszyna testify that, although she told the officers that she had a seizure and "still was out of it," the officers told her what to write in her statement. The jury also heard the officers testify as to what Kruszyna told them had happened. In addition, the jury heard Kruszyna testify that she was in a long-term relationship with defendant, whom she loved, relied on, and wanted to help, and that defendant had previously been charged and convicted of domestic battery against her. After hearing the evidence and watching Kruszyna and the officers testify, the jury could have reasonably concluded that Kruszyna's written statement provided shortly after the incident was more believable than her trial testimony.

¶ 30    Nevertheless, defendant directs our attention to cases where a recanted prior statement and "the remaining evidence" were held insufficient to sustain a conviction. However, each of these cases was decided under its particular facts and circumstances; they do not establish, as a matter of law, that a recanted prior statement cannot support a conviction. See *People v. Brown*, 303 Ill. App. 3d 949, 965 (1999) (the witness's disavowed prior statement was insufficient to sustain the conviction where it was not made until nearly two years after the crime occurred when the witness was in custody and afraid that he would be charged with a drug offense); *People v. Arcos*, 282 Ill. App. 3d 870, 871 (1996) (reversing the defendant's conviction where the sole evidence was the disavowed prior statement of a single witness, whom the trial court found to be a " 'thoroughly disreputable person who cannot be believed' "); *People v. Reyes*, 265 Ill. App. 3d 985, 989-91 (1993) (reversing the defendant's conviction after finding that the credibility of two witnesses'

grand jury statements, which were both recanted at trial, was highly suspect because they consisted of one-word responses to leading questions from the State and one of the witnesses testified that the police coerced her into identifying the defendant); *People v. Parker*, 234 Ill. App. 3d 273, 276, 280-81 (1992) (reversing the defendant's conviction where three witnesses' recanted statements were prepared by the police and signed by two of the witnesses under coercive circumstances and by the third witness while he was recovering from surgery and wanted to get the officer to leave his hospital room). Similar circumstances are simply not present here.

¶ 31   In addition, we disagree with defendant's argument that "the testimony of responding police officers *** cast doubt on the veracity and reliability of Kruszyna's written statement." On the contrary, Harvey testified that Kruszyna told him her version of events twice. Kruszyna's recitations of events were consistent both with each other and her written statement. Indeed, Harvey testified that he intentionally gave Kruszyna time to think while he went to speak with defendant and then had her retell her version of what happened to ensure that it did not change. Vollmer also testified as to what Kruszyna reported, which was again consistent with her written statement. In addition, Vollmer testified that defendant provided inconsistent versions of the events and that it seemed defendant

"was torn between whether or not he wanted to give [Vollmer] the story where he had a verbal disagreement or argument with [Kruszyna] or if he was trying to continue with the story that he had no idea and he was just secluded in his room without any knowledge of anything that was going on."

¶ 32   In sum, considering Kruszyna's prior written statement, which she provided shortly after the incident, along with the remaining evidence, we cannot say that the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt.

¶ 33                                  III. CONCLUSION

¶ 34    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 35    Affirmed.